UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
AMIDAX TRADING GROUP, on behalf of itself and
all others similarly situated,

                                Plaintiff,                    08 Civ. 5689 (PKC)

          -against-                                  MEMORANDUM
                                                                AND
S.W.I.F.T. SCRL, S.W.I.F.T. PAN-AMERICAS, INC.,     ORDER
S.W.I.F.T., INC., JOHN SNOW, in his personal and
professional capacities, STUART LEVEY, in his
personal and professional capacities, UNITED
STATES DEPARTMENT OF THE TREASURY,
GEORGE W. BUSH, in his personal and
professional capacities, CENTRAL INTELLIGENCE
AGENCY, RICHARD CHENEY, in his personal and
professional capacities, GEORGE TENET, in his
personal and professional capacities, MICHAEL
HAYDEN, in his personal and professional capacities,
and HENRY M. PAULSON, JR., in his personal and
professional capacities,

                                Defendants.
-----------------------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

        Amidax Trading Group ("Amidax") brings this action on behalf of itself and purportedly on behalf of all others similarly situated against two sets of defendants: S.W.I.F.T. SCRL, S.W.I.F.T. Pan-Americas, Inc., and S.W.I.F.T., Inc. (collectively, "SWIFT"), a banking consortium; and the United States Department of the Treasury ("Treasury Department" or "Treasury"), the Central Intelligence Agency ("CIA"), and seven former high-ranking federal officials in their professional and individual capacities (collectively, the "Federal Defendants").[1] Plaintiff seeks money damages, a declaratory judgment, and injunctive relief, under the First and Fourth Amendments to the United States Constitution, the Right to Financial Privacy Act

---

[1] The individual federal defendants are George W. Bush, Richard Cheney, Henry M. Paulson, Jr., John Snow, Stuart Levey, George Tenet and Michael Hayden.

("RFPA"), 12 U.S.C. §§ 3401, et seq., and various state laws and constitutions. These claims for relief stem from administrative subpoenas issued by the Treasury Department to SWIFT pursuant to the Terrorist Finance Tracking Program ("TFTP"), which allegedly resulted in Treasury unlawfully obtaining Amidax's financial information from SWIFT.

Plaintiff filed its complaint on June 23, 2008.[2] Defendants move to dismiss pursuant to Rule 12(b)(1), Fed. R. Civ. P., for lack of standing under Article III of the Constitution. For the reasons explained below, this motion is granted and the action is dismissed for lack of subject matter jurisdiction. The Court does not reach the other grounds for dismissal asserted by SWIFT and the Federal Defendants.

BACKGROUND

The following facts, taken from the complaint and the exhibits attached to it, are accepted as true for the purposes of this motion.[3] See De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 69 (2d Cir. 1996) ("The complaint is deemed to include any document annexed to it as an exhibit."). Where a conclusory allegation in the complaint conflicts with a statement made in a document attached to the complaint, the document controls and the allegation is not accepted as true. See Williams v. Citibank, N.A., 565 F.Supp.2d 523, 527 (S.D.N.Y. 2008); see also Feick v. Fleener, 653 F.2d 69, 75, 75 n.4 (2d Cir. 1981).

Amidax is a sole proprietorship based in New Jersey that sells household cleaning products to customers throughout the world. (Compl. ¶ 10.) SWIFT, the Society for Worldwide

---

[2] Although plaintiff refers to an "Amended Complaint," (see Pl. Mem. in Response to Fed. Def.'s Mot. at 10), no such document was ever filed with the Court.
[3] Exhibit A of the complaint is a DVD containing the video of a press conference on June 23, 2006 with defendants Mr. Snow and Mr. Levey. (See also SWIFT Mem. Ex. 1 (verbatim transcript of press conference, available at 2006 WL 1721554).) Exhibit C of the complaint is a newspaper article: Eric Lichtblau and James Risen, Bank Data Sifted in Secret by U.S. to Block Terror, N.Y. TIMES, June 23, 2006, at A1. Exhibit D is another article: Sheryl Gay Stolberg and Eric Lichtblau, Cheney Assails Press on Report on Bank Data, N.Y. TIMES, June 24, 2006, at A1.

Interbank Financial Telecommunication, is a Belgium-based cooperative of banks "that routes about $6 trillion daily between banks, brokerages, stock exchanges and other institutions." (Id. Ex. C; see also id. Ex. D.) It is the "nerve center of the global banking industry." (Id. Ex. C.) It is not a bank; rather, it "provid[es] electronic instructions on how to transfer money among 7,800 financial institutions worldwide." (Id.) It is "the premier messaging service used by banks around the world to issue international transfers." (Id. Ex. A.)

After the September 11, 2001 terrorist attacks, the executive branch initiated a program to gain access to financial records of people suspected of having ties to terrorism. (Id. Ex. A, C.) Run out of the CIA and overseen by the Treasury Department, the TFTP authorized Treasury to use administrative subpoenas to obtain records from SWIFT without requiring a court-approved warrant or subpoena. (Id. ¶ 30, Ex. C, D.) The subpoenas were issued by the Office of Foreign Asset Control ("OFAC"), within Treasury. (Id. Ex. C.) After obtaining the information requested by the subpoenas, government officials were able to conduct certain targeted searches through the data. (See id. Ex. A, C, D.)

OFAC initially issued a "narrowly targeted subpoena" to SWIFT, seeking only records of individuals "tied to terrorism." (Id. ¶ 1; see id. Ex. D.) SWIFT allegedly could not respond to such a narrow request, but offered to turn over its entire database if the government issued "a valid subpoena." (Id. Ex. C.) This appears to have led to a negotiation between SWIFT and the government regarding the appropriate scope of disclosure and the extent of the privacy safeguards that would be in place. (Id. Ex. A, C.) Among other things, Treasury hired "an outside auditing firm that verifies that the data searches are based on intelligence leads about suspected terrorists." (Id. Ex. C; see id. Ex. A.) Plaintiff alleges "[u]pon information and belief" that "SWIFT provided its entire database to the United States Government as part of the TFTP."

3

(Id. ¶ 27.)  Plaintiff alleges that its financial information was contained in the SWIFT database because plaintiff used SWIFT to receive payments from international customers.  (See id. ¶ 11.)  And thus, plaintiff further alleges "[u]pon information and belief" that "SWIFT disclosed Plaintiff's transactions when it provided its entire database to the United States Government."  (Id. ¶ 28.)

As discussed in greater detail below, the overall complaint -- including the exhibits attached to it -- contradicts and undermines the conjectural allegation that the government obtained the entire SWIFT database, and thus fails to adequately allege that Amidax's data was disclosed to the government.

DISCUSSION

The Court turns to the issue of plaintiff's standing because if standing is lacking then the court is without subject matter jurisdiction to consider defendants' other arguments for dismissal.  Article III standing "is the threshold question in every federal case, determining the power of the court to entertain the suit."  Ross v. Bank of Am., N.A. (USA), 524 F.3d 217, 222 (2d Cir. 2008) (quoting Warm v. Seldin, 422 U.S. 490, 498 (1975)) (quotation and citation omitted); see Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 929 (2d Cir. 1998) (federal district courts are "duty-bound . . . to address the issue of subject matter jurisdiction at the outset").  "A court presented with a motion to dismiss under both Rule 12(b)(1) and 12(b)(6) must decide the jurisdictional question first," Adamu v. Pfizer, Inc., 399 F.Supp.2d 495, 500 (S.D.N.Y. 2005) (quotation omitted), because "dismissal under Rule 12(b)(6), i.e., for failure to state a claim, is an adjudication on the merits with preclusive effect." Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 88 n.6 (2d Cir. 2006); see also Steel Co.

4

v. Citizens for a Better Env't, 523 U.S. 83, 101 (1998) (stating that there is no "doctrine of hypothetical jurisdiction"); Merritt v. Shuttle, Inc., 187 F.3d 263, 269 (2d Cir. 1999) ("The existence of subject matter jurisdiction goes to the very power of the district court to issue . . . rulings.").

A. Governing Law

       1. Rule 12(b)(1)

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff . . . but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Morrison v. Nat'l Australia Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008) (quotations and citations omitted).

In deciding such a motion, the court is free to consider materials outside the pleadings. Id.; see State Employees Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 77 n.4 (2d Cir. 2007) ("[t]he distinction [between a Rule 12(b)(6) motion and a Rule 12(b)(1) motion] is significant: while we must accept all factual allegations in a complaint as true when adjudicating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), . . . we have held that, in adjudicating a motion to dismiss for lack of subject-matter jurisdiction, a district court may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits") (citation omitted). Indeed, "once the Defendants' motion to dismiss for lack of jurisdiction under Fed. R.

Civ. P. 12(b)(1) put[s] the Plaintiff[']s[] Article III standing in issue, the District Court has leeway as to the procedure it wishes to follow." Alliance for Envtl. Renewal, Inc., 436 F.3d at 87-88 (footnotes omitted) (citing Gibbs v. Buck, 307 U.S. 66, 71-72 (1939) ("As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court.")).

2. Standing Doctrine

"Article III, § 2, of the Constitution restricts the federal 'judicial Power' to the resolution of 'Cases' and 'Controversies.' That case-or-controversy requirement is satisfied only where a plaintiff has standing." Sprint Commc'n Co., L.P. v. APCC Servs., Inc., ___ U.S. ___, 128 S.Ct. 2531, 2535 (2008). To have standing under Article III, "a plaintiff must adequately establish: (1) an injury in fact (i.e., a 'concrete and particularized' invasion of a 'legally protected interest'); (2) causation (i.e., a 'fairly . . . trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (i.e., it is 'likely' and not 'merely speculative' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit)." Id. (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992) (calling these the "irreducible constitutional minimum" requirements)) (quotation omitted). "[A] plaintiff must demonstrate standing for each claim he seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).

The requirement that the plaintiff have suffered a concrete and particularized injury in order to bring an action guarantees that the party has a "personal stake" in the outcome of the litigation. Baker v. Carr, 369 U.S. 186, 204 (1962); see Lujan, 504 U.S. at 560 n.1 ("the injury must affect the plaintiff in a personal and individual way"). This "assure[s] that concrete

6

adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." Mass. v. E.P.A., 549 U.S. 497, 517 (2007).

The necessity of an injury in fact is particularly important in cases such as this, brought against the executive branch, where the plaintiff "is suing to stop . . . illegal conduct and hold [the federal government] responsible for [its] illegal conduct." (Compl. ¶ 5.); see Lujan, 504 U.S. at 561-62. It "is an established principle that to entitle a private individual to invoke the judicial power to determine the validity of executive . . . action he must show that he has sustained or is immediately in danger of sustaining a direct injury as the result of that action and it is not sufficient that he has merely a general interest common to all members of the public." United States v. Richardson, 418 U.S. 166, 177-78 (1974) (quotation omitted). In other words, "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972). This is because "[t]he judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of . . . executive acts." Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 471 (1982). "The federal courts are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution." Hein v. Freedom From Religion Foundation, Inc., ___ U.S. ___, 127 S.Ct. 2553, 2562 (2007). Indeed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." Raines v. Byrd, 521 U.S. 811, 818 (1997) (quotation omitted).

B. Application

To determine whether an actual case or controversy exists, the Court begins by asking whether plaintiff has adequately alleged an "injury in fact." Such an injury must be "concrete" and "particularized," as well as "actual" or "imminent," and must not be "conjectural" or "hypothetical." Lujan, 504 U.S. at 560.

1. Plaintiff's Alleged Injury

Plaintiff brings claims under the First Amendment, the Fourth Amendment, the RFPA, and various state laws and constitutions. (See Compl. ¶¶ 56-96.) Plaintiff must establish standing with respect to each claim. See DaimlerChrysler Corp., 547 U.S. at 352.

A review of the complaint reveals that plaintiff alleges the exact same injury with respect to all of its claims for relief. Plaintiff claims that: defendants' "acts of request, disclosure, and acceptance" of information from the SWIFT database violated the Fourth Amendment, (Compl. ¶ 57); defendants' "fail[ure] to protect" the "financial transactions transmitted, collected, and/or stored by SWIFT" including "financial donations, contributions, or other expression of political, religious, or other personal beliefs through [plaintiff's] financial transactions" violated the First Amendment, (id. ¶¶ 62, 63, 65); defendants "requested, disclosed, and accepted information contained in customer financial records" in violation of the RFPA, (id. ¶ 75); "the unlawful interception of . . . communications and the disclosure and/or divulgence and/or use of the contents of such communication" violated various state wire interception statutes, (id. ¶ 77); defendants violated various state consumer protection statutes and state constitutions by "requesting, divulging, and accepting records" from SWIFT, (id. ¶¶ 80, 85); and SWIFT is liable for breach of contract and breach of warranty for divulging plaintiff's

information to the government, (id. ¶¶ 89, 95). Plaintiff does not allege that it has suffered any specific detriment as a result of the alleged disclosure of its financial information to the government.

These allegations make clear that, at bottom, plaintiff describes an identical injury with regard to each claim for relief, i.e., that plaintiff's financial information was unlawfully obtained by the government from SWIFT. Thus, plaintiff either has standing to assert all its claims, or no standing to assert any of them, depending on whether this injury has been adequately alleged.

2. Whether Plaintiff's Financial Information was in the SWIFT Database

As a preliminary matter, it is not clear that Amidax's financial information was in fact contained in the SWIFT database. Plaintiff's allegation that "Amidax is a customer of Defendant SWIFT," (Compl. ¶ 11), is contradicted by plaintiff's own evidence on this motion. A certification submitted by Marcello Schor, the sole proprietor of Amidax, concedes that Amidax "do[es] not have [an] individual SWIFT account number[] but must use [its] financial institution's SWIFT account to effect money transfers." (Schor Cert. ¶ 7.) This certification states that Amidax has used the SWIFT network "for at least the past 15 years" by "us[ing] the SWIFT account number assigned to my bank, Commerce Bank, now T.D. Bank." (Id. ¶¶ 5, 6.) A declaration filed by Vincent Gibson, a SWIFT manager, states that "Amidax is not a member or customer of SWIFT and . . . has never been a member or customer of SWIFT." (Gibson Decl. ¶ 4.) Mr. Gibson states that "Amidax is not authorized to use SWIFT's messaging services or software products; nor . . . has Amidax ever been authorized to use SWIFT's messaging services or software products." (Gibson Decl. ¶ 6.)

Plaintiff implicitly urges the inference that because Commerce Bank was a member of the SWIFT network, and because plaintiff used Commerce Bank to receive international wire transfers, those transfers must have been transmitted using the SWIFT network and plaintiff's financial information must be in the SWIFT database. Although Mr. Schor states that Amidax <u>currently</u> uses "Commerce Bank, now T.D. Bank," (Schor Cert. ¶ 6), neither Mr. Schor's certification nor the complaint alleges the date on which Amidax became a customer of Commerce Bank. Mr. Schor's certification includes two documents: an Amidax customer invoice dated August 7, 2008, which lists a SWIFT code; and a letter from Commerce Bank to Amidax, dated May 27, 2008, notifying Amidax of an incoming international wire transfer. (Schor Cert.) Notably absent from the Commerce Bank letter is the SWIFT code listed on the Amidax invoice, or any reference whatsoever to SWIFT. (<u>Id.</u>) The documents are dated years after the government allegedly obtained plaintiff's data.

Despite the scant support for the proposition that plaintiff's data was contained in the SWIFT database during the period after September 11, 2001 and prior to the public disclosure of the TFTP in 2006, the Court will assume for the purpose of this motion that plaintiff has adequately alleged this critical fact.

3. <u>Whether Plaintiff's Financial Information was Obtained by the Government</u>

Assuming that Amidax's financial information was contained in the SWIFT database, plaintiff lacks standing because it has failed to adequately allege that this information was obtained by the government. Again, the Court notes that plaintiff's complaint includes the exhibits attached to it, in particular the June 23, 2006 press conference with Mr. Snow and Mr. Levey and the June 23 and June 24, 2006 <u>New York Times</u> articles. (<u>See</u> Compl. Ex. A, C, D.)

Plaintiff makes only two assertions in support of its allegation that the government obtained plaintiff's financial information from SWIFT. First, plaintiff alleges that Treasury Secretary John Snow stated at the June 23 press conference that SWIFT "said to us, 'We'll give you all the data.'" (Id. ¶ 1, Ex. A; see also id. ¶ 3, Ex. D.) Second, plaintiff alleges that an "unnamed person close to the operation" stated to the New York Times that "[a]t first, they (the U.S. Government) got everything – the entire SWIFT database." (Id. ¶ 2; see id. Ex. C.)

On their face, it is doubtful that these two speculative and conjectural assertions could suffice to establish that the government obtained Amidax's financial information from SWIFT. Mr. Snow's statement that SWIFT offered to turn over "all the data" to the government does not mean that SWIFT did in fact do so. (Id. Ex. A.) And the statement that the government initially "got everything – the entire SWIFT database" was uttered by an anonymous source quoted by a newspaper. (Id. Ex. C.) The complaint gives no indication that plaintiff conducted any kind of inquiry to determine whether the anonymous source was reliable or whether the statement itself was accurate. See Rule 11(b), Fed. R. Civ. P.

Placing these two statements -- extracted from exhibits to the complaint -- in the context of the entire complaint fatally undermines the allegation that the government obtained the entire SWIFT database. Thus, taken in its totality, the complaint does not allege that Amidax's financial information was disclosed to the government. At the June 23 press conference, Mr. Snow stated that SWIFT "said to us, 'We'll give you all the data.' They knew from the beginning that that wasn't our objective, to get all the data. Our objective was this carefully targeted on intelligence leads leading to terrorism. And over time, we've worked together -- it's been a very cooperative effort -- to narrow the scope of our subpoena." (Compl.

11

Ex. A.) Shortly after making this statement, Mr. Snow was asked whether he meant that SWIFT "volunteered to give [the government] everything." (Id.) Mr. Snow responded:

> Well, no, what they said is we can't comply with that subpoena. We don't know how to extract the data. You've got to help us get at what you want. And we said, all right, if that's the only way we can get it, then we will set up a process so that we extract the data. And then we worked out these controls and safeguards to assure that we were only getting data that was pursuant to the subpoena, that the inquiries were narrowly targeted on intelligence leads.

(Id.) Thus, Mr. Snow clarified that SWIFT did not turn over its entire database, but rather worked with the government to set up a process through which the government could obtain data responsive to its "narrowly targeted" requests. Later in the same press conference, Mr. Levey explained that:

> The SWIFT subpoena is powerful, but narrow, as it allows us access only to that information that is related to terrorism investigations. We are not permitted to browse through this data, nor can we search it for any nonterrorism investigation. In practice, this means that we have access to only a minute fraction of the data we obtain from SWIFT.

(Id.) Thus, the totality of the statements made at the June 23 press conference -- and incorporated into the complaint -- does not allege that the government obtained the entire SWIFT database.

Plaintiff's reliance on the anonymous source from the June 23 New York Times article is similarly misplaced. The same article that quotes the anonymous source as saying that "[a]t first, they got everything -- the entire Swift database" also quotes "government officials" as stating that "[t]he program is limited . . . to tracing transactions of people suspected of having ties to Al Qaeda." (Id. Ex. C.) The article quotes a "former senior counterterrorism official" as stating that although "'the potential for abuse is enormous,'" "tight controls are in place." (Id.) Mr. Levey is quoted as explaining that the government is "not on a fishing expedition . . . not just turning on a vacuum cleaner and sucking in all the information that we can." (Id.) While Mr.

12

Levey estimates that the TFTP enabled the CIA and other agencies "to examine 'tens of thousands' of financial transactions," the article notes that "Swift routes more than 11 million transactions each day."[4] (Id. Ex. C (emphasis added).) The article quotes "a senior counterterrorism official" as saying that the CIA "was chomping at the bit to have unfettered access to the information" in the SWIFT database but was forced to "compromise" by accepting the imposition of "tighter controls." (Id.)

       In sum, in a newspaper article based on discussions with "[n]early 20 current and former government officials and industry executives," there is one unnamed person quoted as saying that the government initially got "the entire Swift database." (Id.) Every other person quoted explains that there was a limit to the amount of information provided by SWIFT and there were controls and restrictions constraining the ability of government officials to search through the data provided. Of course, plaintiff need not establish that the government obtained access to the entire SWIFT database. To establish an injury in fact -- and thus, a personal stake in this litigation -- plaintiff need only establish that its information was obtained by the government. See Sierra Club, 405 U.S. at 734-35 ("the 'injury in fact' test requires . . . that the party seeking review be himself among the injured"). However, plaintiff has not made any showing that the government is now, or ever was, in possession of its financial information. See Am. Civil Liberties Union v. Nat'l Sec. Agency, 493 F.3d 644, 677 (6th Cir. 2007) (explaining that because "plaintiffs do not, and cannot, assert that any of their own communications have ever been intercepted" plaintiffs lack standing to challenge the National Security Agency's Terrorist Surveillance Program on Fourth Amendment grounds) (footnote omitted).

---

[4] Exhibit D notes that the TFTP "allowed counterterrorism authorities to gain access to millions of records of transactions routed through Swift" but that "[i]nvestigators have used the data to do 'at least tens of thousands, maybe hundreds of thousands of searches' of people and institutions suspected of having ties to terrorists." (Compl. Ex. D.)

13

Plaintiff's complaint does not allege a concrete and particularized injury. It is premised upon conjecture and requires the kind of speculation that the Supreme Court has prohibited. It would be purely "hypothetical" to surmise that plaintiff's financial information was among the tens of thousands (or perhaps hundreds of thousands) of SWIFT transactions obtained or reviewed by the government; and it would be entirely "conjectural" to suppose that an anonymous source quoted in one paragraph of an article is more reliable or accurate than any other source quoted elsewhere in the article. See Lujan, 504 U.S. at 560-61. Read in its entirety, the complaint is a patchwork of guesses and contradictions. Thus, plaintiff has failed to adequately allege an injury in fact, and, therefore, the Court need not consider whether the remaining standing requirements of causation and redressability have been met.

The Court acknowledges that defendants' potential invocation of the state secrets privilege, (see Federal Def.'s Mem. at 35 n.15), raises the possibility that neither plaintiff nor anyone else will ever be able to establish that its data was obtained by the government from SWIFT. However, as the Second Circuit has noted, "perhaps no one could ever have standing to raise this issue. But such is irrelevant for determining whether the 'case' or 'controversy' requirement has been satisfied." In re United States Catholic Conference (Abortion Rights Mobilization Inc. v. Baker), 885 F.2d 1020, 1031 (2d Cir. 1989), cert. denied, 495 U.S. 918 (1990). "The assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing," Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 227 (1974), because that "view would convert standing into a requirement that must be observed only when satisfied." Valley Forge, 454 U.S. at 489. Indeed, the Second Circuit has explained that "the lack of a plaintiff to litigate an issue may suggest that the matter is more appropriately dealt with by Congress and the political process." Catholic Conference, 885 F.2d

14

at 1031. Because plaintiff lacks standing, this action must be dismissed for lack of subject matter jurisdiction.[5]

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss for lack of subject matter jurisdiction is granted. The Clerk shall enter judgment for the defendants.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
February 13, 2009

---

[5] Given the insufficiency of plaintiff's allegations of standing, the Court finds that jurisdictional discovery is not warranted. See Alliance for Envtl. Renewal, Inc., 436 F.3d at 87-88; Jazini v. Nissan Motor Co., Ltd., 148 F.3d 181, 185-86 (2d Cir. 1998). Plaintiff's request for leave to amend its complaint in unspecified ways is denied because any amendment would be futile. See Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008).